# Meade, Appellant, *v.* Pennsylvania Railroad Company.

Argued October 13, 1953. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*John E. Evans, Jr.,* with him *Evans, Ivory & Evans,* for appellants.

*Bruce R. Martin,* with him *Dalzell, Pringle, Bredin & Martin,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 24, 1953:

Two actions in trespass were brought against the Pennsylvania Railroad Company by Delbert H. Meade and the Great Lakes Forwarding Corporation to recover damages for personal injuries and property damage resulting from a grade crossing collision. The cases were consolidated for trial and the jury returned verdicts in favor of the plaintiffs. The court granted the defendant's motions for judgment *non obstante veredicto* in each case. Plaintiffs appealed.

The appellants' claims are based on alleged insufficient and untimely warning of the train's approach to the crossing. In granting the defendant's motions for judgment *non obstante veredicto* the court below held there was no affirmative evidence of negligence, direct or inferential, on the part of the defendant.

The plaintiff Meade and Herbert M. Ross, employes of the Great Lakes Forwarding Corporation, were each operating an empty tractor caravan trailer, a type used for transporting new automobiles. Both tractor-trailers were forty-five feet long. On the morning of

June 1, 1948 they were engaged in driving the empty tractor-trailers from Philadelphia to Toledo, Ohio, having delivered their cargoes of motor vehicles. They were traveling west on route 220, intending to make a right turn in the road in the Borough of Tyrone. Plaintiff Meade was in the lead with Ross following in his machine. Meade missed the turn, Ross overtook Meade and assumed the lead. It was 3:30 in the morning and the weather foggy. They approached the grade railroad crossing, the main line of defendant railroad, consisting of five tracks running east and west, over which were operated many express passenger trains at high speed and numerous freight trains. Their intention was to cross the railroad, and come upon route 220 which they had missed in Tyrone. The road which they were on ran across the tracks and led from Tyrone to Thomastown, about one mile south of the crossing. It was of macadam construction and twenty-five to thirty feet wide north of the crossing. For a distance the road ran parallel to the tracks and then took an abrupt right angle turn to the left across the tracks and the station platform which was situated between the third and fourth sets of tracks. A light was located on the middle of the platform above and beside the roadway. After crossing the tracks and the station platform the road turned again to the right at a right angle. There was also another road to the left at right angles to the track. A bank bounded by a retaining wall was directly in front of traffic as it proceeded across the tracks. The road to the right was not more than twelve to fifteen feet wide; that to the left was eight feet wide. Thus in crossing the tracks the only alternatives were to go right or left on these narrow roads. Ross, who so preceded Meade in his tractor-trailer, made the turn across the tracks and upon reaching the other side found that he would be

unable to negotiate the turns either to the right or left. He shifted out of gear, set the emergency brake, and opened the door to alight from the cab to inform Meade of the situation. He noticed at this time that the warning lights were blinking and the crossing bell was ringing signaling the approach of a train. Ross then closed the door, put the tractor in gear, released the emergency brake and drove forward a few feet at a speed of three miles an hour. He went as far as possible and then turned the tractor up the road to the left. This maneuver removed this trailer from the fourth track over which the train was approaching. When Ross had gone as far as he was able and was about to jump from the tractor, through his right rear view mirror he observed Meade drive up on the right side of his trailer, hit the wall and endeavor to cause the tractor to climb the bank. As Meade was attempting thus to climb the bank the train struck the rear of his trailer, threw it into the tractor-trailer Ross was driving and dragged Meade's tractor-trailer down the track approximately one hundred and twenty-five feet with Meade in its cab.

Meade testified that he had lost sight of Ross in the fog and that before committing his truck to the tracks he brought his tractor-trailer to a stop and looked and listened. He then proceeded across the tracks after noticing that there were no signals in operation. He testified that the light on the platform in the middle of the tracks caused him to believe this was the end of the crossing since it was as far ahead as he could see. When he reached the light he realized that there were two additional sets of tracks. As he passed under the platform light he became aware that the flashing lights were in operation. It was then he noticed Ross's trailer to his left on the tracks. He also testified that he then went forward in first gear as

quickly as possible, hit the wall, tried to climb the bank, but was struck by the oncoming train. The record discloses that there were several warning signs along the street on the north side of the tracks which informed users that the street was not a through highway and that there was a dead end near. The drivers testified that the signs were not visible due to the foggy weather.

The liability of the defendant railroad under the factual situation here presented, the appellants contend, should be predicated upon a violation of the duty to give the traveling public sufficient and adequate notice of the approach of the train.

On an appeal from a judgment *non obstante veredicto* in favor of the defendant, it is axiomatic that we must view the facts and the inferences deducible therefrom in the light most favorable to the plaintiff. Meade testified that he did not see the crossing lights flash and did not hear the bells ring until he got to the fourth track. He heard the train whistle and saw its headlight after he had gone about another ten feet. The span of time when the first signal was seen until the collision was about three to six seconds. This Court said in *Anstine v. Pennsylvania Railroad Company*, 342 Pa. 423, 428, 20 A. 2d 774: "As to what constitutes adequate warning of the approach of a train to a public crossing, we said, in Bickel v. Pennsylvania R. R. Co., 217 Pa. 456, 460: '. . . it was the duty of the defendant's employees in charge of the train to have given *timely* and *sufficient* warning of its approach to the crossing in view of the circumstances of the case, such as the *character of the crossing, the ability of travelers to see an approaching train, the rate of speed of the train, etc.* . . . While the law does not point out any particular mode or manner in which notice of trains approaching a crossing shall be given, it does require

that some suitable and adequate means, *adapted to the circumstances,* shall be adopted and applied.'

"It is true that decisions involving the adequacy of the signal of the railroad generally turn on whether the warning was given soon enough in view of the rapid movement of the train (see, for example, Childs v. Pennsylvania R. R. Co., 150 Pa. 73; Cummings v. Pennsylvania Railroad, 304 Pa. 219), but, by the same token, the adequacy of the signal may just as well depend upon whether it was given too soon, in view of the retarded rate of speed of the train. In either event, the question is whether the warning is *timely* in view of all the circumstances . . . ." In view of the testimony of lack of timely warning, which we are required to accept on application *non obstante veredicto,* it cannot be held, as *matter of law,* that the defendant gave adequate notice of the train's approach.

Meade placed himself and his tractor-trailer in this dangerous position, however, as a result of his failure to use due care under the circumstances. Contributory negligence is declared as matter of law where it is clearly revealed that fair and reasonable individuals could not disagree as to its existence: *Van Note v. Philadelphia Transportation Company,* 353 Pa. 277, 45 A. 2d 71; *Callahan v. A. Wishart & Sons Company,* 365 Pa. 498, 76 A. 2d 386. Photographs introduced in evidence show that on the road running parallel north of the tracks and before reaching the crossing there were six warning road signs in addition to the regular railroad crossing signs. One sign located on the side of the station read "Caution Not A Thru Highway". This sign was lighted with an electric light. Below this sign was a reflector sign which read "Stop. Dead End". Farther down the road was another reflector sign also reading "Stop. Dead End". On farther was another sign "Caution Not A Thru

Highway". Then directly in front of traffic before it turned left over the tracks was a large sign four feet by five feet with black diagonal marks on a yellow background which read "Sharp Curve Over Railroad Tracks". To the left of this large sign was another "Stop. Dead End" sign.

For plaintiff to have passed six warning signs when driving such a lengthy vehicle without investigation, clearly constitutes contributory negligence. It is true plaintiff's evidence shows the weather was foggy. But under such conditions a driver should have been more alert. This is more apparent where plaintiff was operating an unusually large vehicle of forty-five feet in length. The driver of a motor vehicle whose vision is obscured by atmospheric conditions, such as fog, snow or heavy rain, must exercise care commensurate with the situation. Justice WALLING said in *Serfas v. Lehigh & New England Railroad Co.*, 270 Pa. 306, 308, 113 A. 370: ". . . Should we hold that the traveler need not stop to look and listen because of darkness, then we should logically extend the same immunity in case of a fog or snow storm, or when the crossing was dimmed by dust or otherwise, even in the daytime. To so hold would suspend the rule when needed most, and practically destroy it. To this we cannot consent . . . ." See also *Minella v. Pennsylvania Railroad Co. (No. 1)*, 309 Pa. 479, 164 A. 520; *Santore v. Reading Company*, 170 Pa. Superior Ct. 57, 84 A. 2d 375. The same rule applies to signs along the way.

Meade either saw or should have seen some of these signs and realized or should have realized that it would be dangerous to attempt to proceed farther without investigating. To proceed down a country road with which he was unfamiliar, and while lost, driving a vehicle of this length, is an assumption of risk. He should have realized that the road might not be ade-

quate to permit the passage of the vehicle around sharp turns. Under the recited circumstances the plaintiff Meade was contributorily negligent as matter of law, and hence neither he nor the plaintiff Great Lakes Forwarding Corporation is entitled to recover.

Judgments are affirmed.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On May 31, 1948, Delbert H. Meade, employed as a driver, started from his home in Sweet Valley, Pennsylvania, to drive an empty tractor-trailer to Toledo, Ohio, the headquarters of his employer, the Great Lakes Forwarding Corporation. Early the next morning he arrived in Tyrone, Pennsylvania, and, departing from that city, travelled westwardly on a Thomastown Road, which paralleled certain railroad tracks of the defendant company. At 3:30 a.m., he came to an abrupt right-angular turn in the road to the left, the turn coinciding with a railroad crossing. A fellow-employe, Herbert M. Ross, operating a vehicle similar to that of Meade's had preceded Meade and was actually moving over the tracks at the time that Meade stopped to survey the scene before him. Within the inner corner of the turn in the road appeared two signs, one reading STOP—DEAD END, and the other reading: SHARP CURVE OVER RAILROAD TRACKS. The second sign was illustrated with an elongated "S" bearing sharp termini, indicating the acute angle at which a traveller turned to enter upon the tracks and the sharp angle at which he would leave the crossing on the other side. The sign STOP—DEAD END was obviously a warning to the traveller not to proceed directly ahead and could not possibly be interpreted as any prohibition against entering the crossing. As a matter of fact, the second sign, which was at least three times as large as the first mentioned,

and was bordered with conspicuous hatchwork, actually assured the wayfarer of the safety of the crossing since it explained, by means of the graphic arrow, just how one should approach and depart from the railroad right of way.

This passage, known as Wilson Crossing and which traversed five sets of tracks, became a wide brick platform between the third and fourth tracks (proceeding southwardly, in the direction Meade was heading). The platform was illuminated by lamps atop three tall poles. The state of the weather, the earliness of the hour and the matinal fog which hung over the area conspired to create the ocular illusion that the crossing ended at the platform.

Obeying the time-honored injunction against a precipitate entering upon a railroad crossing, the plaintiff-driver stopped, looked and listened. No signal of any kind informed him of any approaching train. Fully conscious, however, of the incipient dangers hovering in the vicinity of all railroad tracks, Meade moved over the crossing slowly and alertly. When he arrived at the platform and his front wheels were "practically up to" the fourth track, light signals blinked and crossing bells rang. Accelerating the speed of his vehicle, Meade moved ahead 10 feet when a yet unseen oncoming locomotive sounded an admonitory blast. In the next instant an express train was upon him. It struck the rear of the tractor-trailer, dragged it some 125 feet, inflicting serious injuries to Meade and demolishing his vehicle, as well as setting it afire.

The learned court below, in setting aside the verdicts which the plaintiffs (Meade and his employer) received from the jury, fell into a serious error which, I am constrained to say, the majority of this Court, in my opinion, has unfortunately adopted. So far as

responsibility for the accident was concerned, there was only one question properly in this lawsuit, namely, did the engineer of the locomotive, which struck the plaintiff, give timely and adequate warning of its approach. The jury said that it did not, and I am convinced, from a reading of the record, that the evidence abundantly bears out the jury's factual conclusion.

The railroad company defendant cannot plead ignorance to the hazards of Wilson Crossing. An overshadowing hill on the western side of the intersection, coupled with a wide sweep in the tracks, made necessary because of the topography of the land, practically screened trains from view until they thundered into the crossing. The engineer involved in this accident had a peculiar and unique knowledge of the properties of the crossing which he regarded as a "jinx." When asked why he was so familiar with this road over the tracks, he replied "because I have hit a lot of automobiles [there]." He then attempted to correct this admission by adding "not a lot," but no retraction could wipe away the fact that he burst into the fog-enshrouded crossing at 60 miles per hour without a warning until the crushing momentum of his locomotive was about to destroy the helpless vehicle in his path.

The right of way of a railroad is not absolute. If it were, no railroad crossing would be legal. Government and the law, however, recognize that although the iron horse must not be impeded in its legitimate errand, it is nonetheless subject to certain rules necessary for the protection of the public which also has the right of unimpaired travel. Through mutual concessions, each may avail itself of the fullest liberty of movement.

Wilson Crossing was in effect a public highway and entitled to be respected as an untrammeled, neutral

thoroughfare over the tracks. A duty devolved upon the railroad company to install such devices as would reasonably protect travellers from destruction by passing trains. The functioning of the warning lights and bells at this crossing was found to be entirely inadequate in the circumstances. A crossing bell which sounds so closely in point of time to the actual arrival of a train is not a bell of warning but a knell of doom. The plaintiff testified that the crash occurred within 3 to 6 seconds after the bell rang. Such brevity in warning has been declared by this Court to constitute negligence. In *Bickel v. Pennsylvania Railroad Company,* 217 Pa. 456, 461, we said: ". . . the rule is established that it is the duty of the employees of a train approaching a crossing to give such signal as will protect the traveler if he is in the exercise of ordinary care. It is not a conclusive answer for a railroad company to say that the bell was rung or the whistle was sounded in reply to a charge that a train negligently approached a grade crossing, *unless it appears that under the circumstances of the case such signal was sufficient to give timely notice to travelers who were approaching the crossing on the highway."*

We further said that the trial judge in that case could have told the jury that: "it was the duty of the defendant's employees in charge of the train to have given *timely and sufficient warning of its approach to the crossing in view of the circumstances of the case, such as the character of the crossing, the ability of travelers to see an approaching train, the rate of speed of the train, etc.,* and that, failing to do so, the plaintiff, in the absence of negligence on the part of the deceased, was entitled to recover."

In *Broad v. Pennsylvania Railroad Co.,* 357 Pa. 478, 481, this Court said in a similar situation: ". . . a number

---

* All italics, mine.

of witnesses for the defense stated that the train whistle was not sounded until immediately before the crash. Clearly, it was for the jury under such evidence to determine whether defendant had given adequate warning of the train's approach."

Considering the speed at which the train in this case was travelling, the alarm should have been sounded early enough so that it would have fallen on the listening ears of Meade as he waited motionless at the north end of the crossing before committing himself to the passage. Had such warning been released, it is reasonable to conclude that Meade would not have started across with his lumbering 45-foot tractor-trailer. To have pressed on, with such a vehicular encumbrance, in the face of dire warning of disaster could only have meant a will to self-slaughter, and there is no evidence to suggest any suicidal intention on the part of Meade. Ross immediately preceded Meade, and he just barely missed being struck by the train since he succeeded in negotiating the crossing before the locomotive arrived. This confirms Meade's testimony that no warning was given before he started over the tracks because had the signal devices been operating at that moment they would, in all likelihood, have been observed also by Ross and he would not have moved forward in the face of such announced and imminent danger.

The lower court, in granting defendant's motions for judgments n.o.v., and this Court, in affirming the lower court's decision, attach a great deal of significance to the events which *preceded* the time of Meade's arrival at the crossing. I fail to see the pertinency of such attachment. Meade either had the right to cross the railroad tracks or he did not. There is not one syllable in the entire record to the effect that the crossing was closed to him or to anyone else. The

STOP—DEAD END sign at the Crossing did not mean that Thomastown Road died at that point. This highway was a macadamized road 25 to 35 feet wide and was used every day by all types of vehicles. The DEAD END sign meant what it obviously said, namely, that one should or could not proceed any further in the straight-ahead direction. One could, however, turn to the left and proceed southwardly on the ample crossing over the tracks. The other sign—SHARP CURVE OVER RAILROAD TRACKS— did not prohibit passage, it invited it; it did not repel travellers, it beckoned them on.

Meade was not a trespasser. He was at a place where he had a legal right to be. The lawsuit in this case therefore, began at the northern end of the crossing; not several miles back.

In supporting the judgment n.o.v. the lower court and the majority of this Court argue that Meade was at fault because he missed the turn in the road into Tyrone, but this argument completely misses the highway of logic and enters on a secondary road of complete irrelevancy. Meade could have missed ten roads and still have the right to cross the tracks without being run down by a locomotive. All the signs which appeared before Meade reached the crossing were no more controlling in this case than circus billboards. One of the signs referred to by the majority—a Stop Dead End sign—was attached to the Pennsylvania Railroad Station in Tyrone, a mile distant from the crossing. It merely advised the traveller that a Pennsylvania Avenue ended at that point and if he did not change his course here, he would run into the Station! It had nothing at all to do with the Wilson Crossing.

Even if we assume that the other signs NOT A THROUGH HIGHWAY were intended to indicate that Thomastown Road was not a through highway, they

offered no enlightenment that it was "not a through highway"—to what? Looking at the photographic exhibits in the case and reading the testimony, it is clear that these signs merely advised that the straightaway of Thomastown Road would end some time soon and, as it developed later, that straightaway-endness occurred at the crossing. The signs did not say that Meade could not reach the next immediate milestone in his journey by proceeding along Thomastown Road and over the crossing. Furthermore, the railroad had no jurisdiction over instructing Meade the course of travel he should follow in reaching any destination satisfactory to himself. Meade had the right to go over the crossing for any reason which offered him advantage in connection with his mission, so long as he violated no law, and the pages of the record repulse any suggestion of law violation.

The lower court and the majority of this Court would penalize Meade because, in the middle of the night and amid a disconcerting fog he took the wrong road. Taking the wrong road is not a phenomenon so strange, and certainly not so interdicted, as to call for a denial of rights otherwise accruing to the traveller, especially, when the mistake in route has nothing to do with the manner in which a later accident befalls the traveller.

Did Meade have the right to cross the tracks? No quantity of discussion, no citing of cases, no historical relating of what occurred prior to 3:30 a.m., June 1, 1948, can reply to that question with any answer but Yes. When Meade arrived at the north end of the Wilson Crossing he and the railroad company stood in parity of legal rights. If Meade is to recover he must show that the railroad company was negligent in failing to exercise the care which the law places upon it. If the railroad company is to prevail it must

overcome the charge of negligence or show that the plaintiff was guilty of contributory negligence. Whether the plaintiff or the railroad company is to win in this litigation is, in the admitted panorama of surrounding circumstances, strictly a question of fact for the jury. And the jury has spoken. By what authority is the jury's decision overridden?

In *Sanders v. Pennsylvania Railroad Company*, 336 Pa. 424, 426-7, the plaintiff was struck at a railroad crossing. He testified as to how he had stopped and listened, how he heard no warning and saw no blinker lights and that visibility conditions were bad. The defendant company presented witnesses to the effect that all signal devices were operating and that the weather was clear. This Court, in affirming a verdict for the plaintiff, said: "There thus resulted a typical case for the jury." Further, this Court said: "The responsibility of decision in this litigation lay with the jury. *The court could not have assumed it without overstepping the bounds of its legitimate functions.*"

In *Wingert v. Philadelphia Ry. Co.*, 262 Pa. 21, 24, the question arose as to whether sufficient warning had been given the plaintiff who was struck at a railroad crossing. This Court held that that question was one for the jury: "According to the testimony of plaintiff he saw the train as it rounded the curve, a greater distance from the point at which defendant's witnesses testified the bell was first rung, and yet was unable to avoid the collision. It might, therefore, be it was not rung in time to serve as ample warning to persons using the crossing; *at all events it was for the jury to say whether the warning was ample and if a whistle should have been blown at a distance from the crossing sufficient to give earlier warning of the approaching train.*"

The question of contributory negligence in the case at bar was properly submitted to the jury, which decided that Meade conducted himself within the standard of ordinary care ascribable to reasonably prudent persons. Could the lower court convict the plaintiff of contributory negligence when the jury had absolved him of that charge? We do not have in this case the doctrine of the futility of testimony opposed to undisputed physical facts. On what basis, therefore, is the verdict of the jury nullified?

The lower court in its opinion quoted from the plaintiff's testimony as follows: "Q. What you looked for is to see if these lights would flash; is that right? A. I was looking for flashing light. Q. That is all you looked for? A. And to hear something. Q. Well, you don't look to hear. A. I was listening for something— looking and listen. Q. I see. At that time did you look over the crossing—look where you were going to go? A. No, because my lights weren't on that."

From this fragment of the plaintiff's testimony the Trial Court concluded that the plaintiff did not look up and down the railroad tracks from his stopped position. But this conclusion ignores the following pertinent portions of the plaintiff's testimony: "Q. What did you do when you stopped there? A. Well, I looked for some signal. I saw it was a railroad there. I looked for some signals to be working. I didn't see any of those, so *I listened for something . . . .* Q. *Were you attentive* in crossing those tracks? A. *Very much so...* Q. Did you ever look down the tracks to your right? A. *I did,* as I came on the tracks from the other side before I came on as far as the headlights would show, which was not too far. Q. Well, you looked as far as your headlights would show? A. That is right, as far as they would show."

The plaintiff inched across the tracks with thin-ice alertness: "Q. And as you went across the tracks you were watching where? Were you watching ahead or were you looking to your left, or where were you looking? A. *Watching for anything to happen."* His speed was only three miles per hour. It is difficult to conjure up greater care. Short of not going on the crossing at all, Meade did everything possible to avoid colliding with a Pennsylvania Railroad express train. How then can it be said that he was contributively negligent?

In *Guilinger v. Pennsylvania Railroad Co.*, 304 Pa. 140, 146, we said: "This court cannot without departing from the established rule in Pennsylvania hold that the plaintiffs, after stopping to look and listen at the usual stopping place, were as a matter of law guilty of contributory negligence because one of them did not alight and go forward and look in both directions from a point where he could have obtained a longer view of the railway they were about to cross."

In *Harris v. Reading Company*, 325 Pa. 296, 301, we said: "Moreover, the testimony introduced on behalf of the plaintiff that the driver did stop, look and listen before attempting to cross the tracks, was sufficient to render the question of contributory negligence one of fact for the jury. *The court cannot take a case from the jury where there is evidence that the person injured did stop, look and listen at the place where those about to cross usually do so."*

In *Muehlhof v. Reading Co.*, 309 Pa. 17, 20, the plaintiff's employe testified that before entering upon a railroad crossing he stopped, looked and listened, then neither seeing nor hearing anything he proceeded forward at a speed of 2 miles per hour. Upon arrival at the second track, he was struck by the defendant's

locomotive which came up in a heavy fog without giving any notice of its approach by whistle or by bell. In reviewing this case and affirming the verdict in favor of the plaintiff, this Court said: "Under these circumstances the question of whether Oberdorf was guilty of any negligence which contributed to the accident *was one for the jury.*"

In *Bush v. Philadelphia & Reading Railway Co.*, 232 Pa. 327, 328, passing upon the question of contributory negligence charged against the plaintiff, this Court said: "Whether he stopped a sufficient length of time to inform himself of conditions, and whether he advanced with due caution from that point, were questions to be determined not by hard and fast rules of positive duty applicable in all cases, but by the jury upon a consideration of all the circumstances in the case. . ." In that case this Court felt that the facts could easily have warranted a conclusion of contributory negligence on the part of the plaintiff. Nonetheless it emphasized that the question was one for the jury: "While upon the whole evidence the jury might well have hesitated before reaching their conclusion that this driver stood clear of negligence, yet the question was exclusively for them, since the evidence to establish negligence on his part was not so clear or positive as to exclude other inference. *The case was one for the jury* and was submitted under proper instructions."

Certainly it cannot be said that any hypothetical negligence on the part of the plaintiff in this case was such as to exclude any other inference.

In *Baker v. Pennsylvania Railroad Company*, 369 Pa. 413, 419, this Court said: "The plain intendment of the ruling in the *Muehlhof* case is that where a traveler stops, looks and listens before entering upon a grade crossing and, neither seeing nor hearing any-

thing approaching on the tracks, proceeds and is thereafter struck by a train on a track beyond the first, the question of his contributory negligence is for the jury." Meade was struck not only beyond the first track, but beyond the *third track.*

In *Ashcraft v. C. G. Hussey and Co.,* 359 Pa. 129, 132, this Court said: "It has long been the established law in this Commonwealth that contributory negligence may be declared as a matter of law *only when it is so clearly revealed that fair and reasonable persons cannot disagree as to its existence.*" Twelve fair and reasonable persons have decided and have agreed that Meade was not guilty of contributory negligence.

This Court has repeatedly advanced the proposition crystallized in the following: "Judgment can be entered for the defendant only if the evidence, viewed in the light most advantageous to the plaintiff, resolving all conflicts therein in his favor, and giving him the benefit of every fact and inference pertaining to the issues involved which may be reasonably deduced therefrom, would not justify a verdict and judgment in his favor." (*Mellott v. Tuckey,* 350 Pa. 74). Contrary to the signal lights flashing in this accepted expression of the law, the lower court and the majority of this Court proceeds to review the evidence in the light most disadvantageous to the plaintiff, resolving all conflicts against him, and depriving him of the benefit of every fact and inference pertaining to the issues which may reasonably be deduced therefrom.

We have here simply a combination of fortuitous incidents crystallizing into an accident. Two sets of forces were involved: a couple of tractor-trailer drivers proceeding on their business undeterred by night and undismayed by weather; and a number of railroad employes seeking to do their work in accordance with their standards of procedure and care. On one side

or the other, some one was at fault. Twelve citizens from Allegheny County chosen for the very purpose of determining the factual issue, heard the evidence, applied the law as given to them by the judge, and concluded that the railroad company was at fault. I can discover no circumstance or reason which would establish that the jurors arrived at a fallacious conclusion. It is my opinion, therefore, that their verdict solemnly arrived at should not be disturbed.