## Hucaluk, Appellant, *v.* Clyde Realty Company, Inc.

170

Argued April 23, 1954. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*Philip J. Gahagan,* for appellant.

*J. Douglas Fackenthal,* with him *Irving W. Coleman* and *Fackenthal, Teel & Danser,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 28, 1954:

These are wrongful death and survival actions in trespass instituted by Helen Hucaluk, individually and as administratrix, against Clyde Realty Company, Inc. and Standard Accident Insurance Company of Detroit to recover damages for the death of plaintiff's husband, Walter Hucaluk, Sr. Defendants, while not decedent's employers, are the owners of the building, in which decedent worked, and an indemnity company, the latter being made a party under the Act of May 2, 1929, P. L. 1518, sec. 4, as amended, 35 PS 1345; *Bollin v. Elevator Construction & Repair Co., Inc.*, 361 Pa. 7, 63 A. 2d 19.

Decedent was struck and fatally injured by a descending freight elevator when he put his head through an opening in a landing gate and into the elevator shaft in order to ascertain the location of the elevator. The trial judge entered compulsory nonsuits which the court in banc refused to remove. The appeals followed.

The undisputed facts are recited by the court below as follows: "Plaintiff's decedent, Walter Hucaluk, Sr., was for approximately 3 years and 4 months an employee of Universal Pants Company, a tenant of defendant, Clyde Realty Company, Inc., owner of a four-story factory building. Universal Pants Company occupied the second and third floors of the building and Clyde Shirt Company occupied the first and fourth floors. The four floors were serviced by a freight elevator maintained by defendant, Clyde Realty Company, Inc. The accident occurred at the elevator landing gate located on the third floor, one of the floors occupied by Universal Pants Company. The framework of the elevator landing gate was made of wood consisting of two upright pieces one on each side and three crosspieces, one at the top, one in the middle and one at the bottom. The framework was covered with one-half inch wire mesh. The landing gate was 5 feet

6 inches high and 7 feet wide. In the upper section of the landing gate, on the right-hand side as one faces the gate, there was an uncovered opening extending upward from the middle crosspiece to the top crosspiece. The opening was 10 inches in width and 22 inches in height and approximately two feet nine inches from the floor. The elevator landing gates on each floor were equipped with automatic locking devices so that the elevator could not be operated unless the elevator landing gates were closed. If the elevator landing gate on any of the floors was open it was impossible for anyone on any other floor to move the elevator. The elevator was motor driven but it was necessary to use a hand cable to start it. To operate the elevator from outside the landing gate it was necessary for the operator to reach through the opening and pull the hand cable. By pulling down on the hand cable the elevator was brought up, and by pulling up on the hand cable the elevator was brought down.

"There were no eye-witnesses to the accident. The manner in which the accident occurred must be gleaned from the res gestae statements of decedent made to Reverend Stephen Chehansky in the presence of decedent's wife, and from the circumstantial testimony of the elevator operator, Francis Harsch.

"Reverend Stephen Chehansky testified that he administered the last rites of the Catholic Church to decedent approximately one hour after the accident and then held the following conversation with decedent: 'I asked him, "Walter, what happened?" and he told me that at that time, during his work, he was asked to move a machine, and he went to the elevator to see whether the elevator was up or down, put his head into an opening in a shaft or window, and at that time this elevator evidently came down, and the accident happened that way.' Plaintiff, Helen Hucaluk,

who was in the room with her husband and Father Chehansky, testified that she heard the following conversation: 'Father Chehansky asked Walter what happened. . . . He said, "I was hit with an elevator. I was moving machinery." He looked for the elevator and . . . hole . . . the shaft . . . and it came down on him. . . .' ". Francis Harsch, decedent's fellow-employe, pulled the cable causing the elevator to descend, which resulted in the elevator striking decedent's head, with fatal consequences.

This case was ably tried in the court below. We need not repeat what the court has so accurately and meticulously considered and ruled in its opinions. It will suffice to state that ordinarily one who puts his head into an elevator shaft and is struck by a descending or ascending elevator is guilty of contributory negligence: *Phelan v. Armstrong Cork Co.*, 282 Pa. 285, 127 A. 835; *Levy v. Fire Association of Philadelphia*, 321 Pa. 45, 183 A. 776. Plaintiff maintains, however, that defendants were guilty of *wanton negligence* in permitting an opening to exist in the elevator's landing gate and hence decedent was exonerated from the responsibility resulting from his *contributory negligence*.

In the leading case of *Kasanovich v. George*, 348 Pa. 199, 34 A. 2d 523, Mr. Justice Stern, now Chief Justice, speaking for an unanimous Court, defined wanton negligence and its legal effect when considering the question of contributory negligence of plaintiff. He said (p. 203) : ". . . that wanton misconduct is something different from negligence however gross, —different not merely in degree but in kind, and evincing a different state of mind on the part of the tortfeasor. Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly

disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong. Having in mind this characterization of wanton misconduct, it will be readily seen that the principle that contributory negligence is not a defense to an action for a tort involving such misconduct is not in conflict with the rejection in Pennsylvania of the doctrines of 'comparative negligence' and 'last clear chance' hereinbefore referred to."

In that case there was testimony by plaintiff's witnesses concerning wanton negligence of the defendant's motorman. In the opinion it is stated (p. 204) : "Instead of giving binding instructions for defendant, the learned trial judge should have instructed the jury that, even if the motorman was grossly negligent, plaintiff, because of decedent's contributory negligence, cannot recover, but that such contributory negligence would not be a bar if the motorman was guilty of wanton misconduct, that is, if he exhibited a reckless disregard for decedent's safety after observing his perilous position and realizing the danger involved in proceeding at a high rate of speed and without giving warning of his approach."

This case has never been overruled and has been cited with approval in numerous cases from *Misorski v. Pennsylvania Railroad Company*, 348 Pa. 204, 34 A. 2d 526, to *Zawacki v. Pennsylvania Railroad Company*, 374 Pa. 89, 97 A. 2d 63.

The facts alleged by plaintiff in the present case clearly do not establish defendants' *wanton negligence.* As above stated, it was the existence and maintenance of the opening in the landing gate which plaintiff contends amounted to wanton negligence. While the elevator was motor driven, it required a pull on a hand cable in order to start the operation of the motor and

the elevator. There could be no movement of the elevator if any landing gate remained open. There were electric bells at each floor for use if the presence of the elevator was required. The opening in the elevator door was approximately two feet nine inches from the floor and was ten inches in width and twenty-two inches in height. The opening was for the sole purpose of enabling the operator's hand to be placed through it in order to pull the cable and thus start the motor. There is not the slightest indication in the testimony that defendants were aware that decedent or any other person had any habit, as alleged, of putting their heads through the hole which would thereby cause them to be injured. Indeed, the testimony discloses that the described condition existed for many years without any indication of danger. Also, decedent worked in the premises for at least three years and was fully aware of the situation. Since there are no disputed facts for submission to a jury, and since we must accept as true decedent's own admission and plaintiff's testimony, together with all inferences in the light most favorable to her, it becomes *matter of law* for the court to determine whether or not wanton negligence has been established and also whether or not plaintiff is barred from recovery because of decedent's contributory negligence.

We have considered, as did the learned court below, the question of whether or not decedent was contributorily negligent and have assumed, but have not decided, that defendants, while not wantonly negligent, nevertheless, were guilty of negligence. The cases cited by plaintiff do not help her. Among them is *Patrick McGuigan v. Robert Beatty*, 186 Pa. 329, 40 A. 490. Defendant in that case, while in the elevator shaft, was injured by a falling weight. The counter-weighted elevator, without motor, was hand operated. It re-

quired the operator's presence in the car and shaft in order to operate it. In *Ferry v. Philadelphia Rapid Transit Company,* 232 Pa. 403, 81 A. 426, there were no warning signals and decedent went into "a trap" unaware of the existence of the elevator. *Schwarz v. Glenn,* 244 Pa. 519, 90 A. 921, was a case where the decedent was in the place of danger on the assurance of a building contractor that the elevator would not operate while he was working therein. In *Strobel v. Park,* 292 Pa. 200, 140 A. 877, a passenger was killed because the elevator door was not equipped with an entrance door or guard and deceased fell forward and was struck by a part of the floor projecting into the elevator shaft. In *Levy v. Fire Association of Philadelphia,* 321 Pa. 45, 183 A. 776, plaintiff's hand was caught between elevator doors. No evidence of negligence of defendant showing defect or fault was shown and nonsuit was there granted. That decedent in the present case was guilty of contributory negligence in placing his head in the elevator shaft is so apparent that no reasonable minds could disagree as to the existence of decedent's contributory negligence. Such negligence must, therefore, be declared as *matter of law*: *Meade v. Pennsylvania Railroad Company,* 375 Pa. 325, 100 A. 2d 612, and the cases therein cited. Since defendants were not wantonly negligent plaintiff is barred from recovering because of decedent's contributory negligence.

The judgments are affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The defendants in this case were not running an elevator; they were operating a guillotine. They provided for a nice, convenient hole in the elevator shaft, just big enough for a head to fit into so that a descending elevator could decapitate, crush or mangle the

mortal calling for transportation. The head-hole was allowed, and this method of elevator-calling permitted, in violation of law, in defiance of safety regulations, and in opposition to every rule of care and precaution owing by landlords to tenants of a building.

The Clyde Building, in which the tragedy of this case occurred, is a four-story factory building in Northampton, Pennsylvania. The Universal Pants Company occupied the second and third floor of the structure. The first and fourth floors were tenanted by the Clyde Shirt Company, a partnership consisting of Barney Salitsky and Isador Weinstein, each owning 25% of the stock in the Clyde Realty Company, which was a holding company for the specific purpose of maintaining the Clyde Building. The other 50% of the stock of the Clyde Realty Company was held by the Billera brothers, who were also proprietors of the Universal Pants Company. These four men, then—officers and stockholders of the Clyde Realty Company—were active managers of the building and practically constantly on the premises.

For some 20 years prior to the accident here involved, the Clyde Building had been serviced by a freight elevator which gave no evidence of having improved with age. Although motor-driven, its movements were controlled by a cable which passed through the floor and ceiling of the elevator cage. A signal bell on each floor was supposed to serve as a means of calling the elevator, but it did not always respond to pressure. When, however, it was mechanically aroused, its answering squeal was often drowned out in the clatter of some 150 electrically-impulsed sewing machines on each floor. Of the 300 persons employed in the building, many who made use of the elevator apparently operated it themselves. Raymond A. Keshel, who had been with the Universal Pants Company for

four years prior to the accident, testified: "Q. Can you tell us the names of any people you saw operate the elevator in May, 1948? A. No, I can't sir, because almost everyone used to use that."

He testified further: "Q. Now, did somebody instruct you on how to use this elevator? A. No. Nobody did. Q. You just got in and used it? A. Well, there was guys there, foremans and bosses, but they never— I just, I don't know, they just said well, here's how the elevator worked, and that's all they did. Q. Did your boss tell you to use the elevator? A. Why, sure, because I was assigned to—Q. Now, you answered the question. He told you to use the elevator? A. Yes."

Francis Harsh, who pulled the cable which dropped the elevator on the decedent and who had been employed by the Universal Pants Company only ten days prior to the accident, had many duties, being simultaneously elevator operator, receiving clerk and sweeper. In order to qualify for elevator operator, a job he had never done before, he was given a course of instruction which lasted 20 minutes! He testified: "Q. What instruction did you receive pertaining to the operation of this elevator in the Clyde Building? A. Well, I was showed how to run it, work it, make it go up and down, stop it. Q. And by whom were you shown how to run the elevator? A. Carlo Billera. Q. And for how long a period of time did Mr. Billera give you instruction in operating this elevator? A. About 20 minutes. Q. About 20 minutes? A. Um hum."

This elevator business in the Clyde Building was a shoddy affair from beginning to end. Often the light in the elevator was not lit or was covered with a dirty rag. The electric bulb outside the landing gate dangled in such a position that when not actually in darkness it threw shadows onto and around the landing and all its dangerous appurtenances. Although the

elevator could be lowered or raised by thrusting a hand into the shaft and pulling the cable, this operation often failed to move the car because of an automatic locking device which immobilized it when the landing gate on any floor was not entirely closed. The right side of the landing gate on each floor was provided with an opening measuring 10 x 22 inches. When a rider failed to summon the elevator by ringing the bell or by jerking the cable, he would thrust his head through this opening and yell into the elevator shaft, calling upon all those who could hear, to close the gate which might be holding the elevator fast.

The elevator was very slow-moving (one witness estimated its speed to be one mile per hour) so that if one did not get a quick response to his call, considerable time was lost before he could obtain vertical transportation. One witness testified to the irritable delays attendant upon this decrepit piece of machinery: "Q .Will you tell what words you heard Mr. Farina use? A. He would say, 'Send that damn elevator down' or send it up—'need it right away,' use a few other words that I wouldn't like to mention. Q. When he would call into the elevator and use the words that you have just used, would the elevator always come? A. Not always. Q. When it wouldn't come, did you see him do anything? A. Well, he'd just—Q. Did you see him do anything? A. Yes. He would walk away until maybe later on when no one was using it, he'd come back later on for it."

If several employes were seeking the use of the elevator at the same time, the car would apparently go to the caller with the strongest pair of lungs. One witness was asked what he would do when the elevator was not on his floor. He replied: "Put my hand in the hole there and—or ring the bell first. If the bell would sound, all right; if not, we'd try to jerk

the wires there, whatever they called them cables. If the elevator wouldn't respond, then you'd put your head through, and you'd start hollering, and *the guy with the loudest voice could get the elevator.*"*

On May 26, 1948, Francis Harsh took the elevator to the second floor and left it for a minute or two to perform a chore on that floor. When he returned, the elevator was gone. He pulled the cable to retrieve the car. At this moment someone called: "Hey, Joe." Immediately thereafter he heard a crash. By means of the stairway Harsh ran to the third floor to discover the cause of the noise. Lying close to the elevator gate he found Walter Hucaluk in a mortally injured condition.

Twelve days later Hucaluk died and his widow brought suit against the owners of the building and the Standard Accident Insurance Company of Detroit. At the ensuing trial, the Trial Judge entered a compulsory nonsuit and this appeal followed.

It is my considered judgment that the lower court erred in not submitting to the jury the questions of liability raised by the evidence. The Court Majority here, in my opinion, also misappraises the issue involved because it treats the case as if all the important facts which gave rise to the litigation occurred in that brief arc of time which passed between the moment that Francis Harsh heard the call of his fellow-worker and the moment that there fell upon his ears the sickening crash on the floor above. In point of truth, the events which culminated in the death of Walter Hucaluk took up more time than can be encompassed within any arc on the dial of a clock. The span of time here involved is not one of seconds or minutes or even hours or days. From the day the defendants

---

* Italics throughout, mine.

learned that the tenants were using the head-hole to call the elevator, the dramatist of fate began to develop the tragedy which was to reach its climax at noon on May 26, 1948. Ostentatiously and noisily the properties were being set on the stage for the killing of 31-year old Walter Hucaluk. The defendants were aware of this ominous preparation. Day after day, month after month, year after year, they saw people using the grim opening in the elevator shaft. They knew, even as much as they later charged Walter Hucaluk with knowing, that this procedure was a perilous one, but they did nothing to stop it. They knew that the law forbade such a procedure, but they ignored the law. A piece of wood nailed over the head-hole on each floor would have shut off at once the impending disaster gathering through that aperture.

The failure of the defendants over a period of years to take the precautionary measures which the circumstances dictated, common prudence decreed, and a decent regard for humanity commanded, convicts them in the book of law and justice of negligence in the highest possible degree.

The Majority Opinion says: "The undisputed facts are recited by the court below" and then proceeds to quote for a page or two from the Opinion of the Trial Court, but the quoted material is far from an adequate description of the facts in the case. The record is 449 pages long and in my study of that record I have encountered many vital, damning facts of negligence which are omitted from the lower court's drastic condensation of the "facts."

In entering a compulsory nonsuit against the plaintiff, the lower court disposed of the case as if Hucaluk had suddenly been struck by a bolt of lightning which he himself had attracted by standing at some spot prohibited by meteorological superintendents. In point

of fact, one could see, throughout the whole 449 pages of the record, the dark clouds gathering for the storm which was to kill Hucaluk. These telltale signs the lower court ignored as if they had never crossed the sky of reality. The situation which brought about the tragedy in this case was 15 years in the making. For 15 years the inexorable elevator in the Clyde Building rose and fell like a blade of fate, just narrowly missing its quarry day after day, but, with its perennially conspiring partners of Negligence and Indifference, it bided its time and finally caught Hucaluk in the trap it had set for him a long time before.

From a civil and moral point of view, the defendants in this case are as responsible for the death of Walter Hucaluk as if they had pulled the cable of the elevator which cut him down in his youthful years. Rule 243, Section B, page 76 of the Rules and Regulations of the Elevator Division of the Department of Labor and Industry, provides that when elevator landing gates are constructed of wire mesh, the interstices shall be of such size as will repel a ball 2 inches in diameter; if made of lattice work the intersecting lattices shall not be more than 2 inches apart. Obviously the head-hole of 10 x 22 inches offended against this rule of the Department of Labor and Industry, promulgated under authority of the Act of Assembly of May 2, 1929.

The defendant, Standard Accident Insurance Company, which had insured the Clyde Realty Company for liability in connection with the operation of the elevator, contracted with the Clyde Realty Company to inspect the elevator and submit reports to the Department of Labor and Industry on the exact condition of the elevator at the time of inspection. The reports submitted by the Standard Insurance Company made no mention of the fact that the elevator gates

contained a hole 10 x 22 inches, this being in direct violation of the Elevator Code. In fact, the reports certified that the elevator was in good condition and equipped in accordance with departmental requirements. By withholding from the Department of Labor and Industry the information which would have caused the Department to order the closing of the head-hole, the defendant Standard Insurance Company made possible the continued existence of the trap which finally closed on Walter Hucaluk and brought about his death.

The Clyde factory building was certainly an "establishment" under the terms of the Health and Safety Act of May 18, 1937, P. L. 64, Sec. 1 "(a) All establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein.

(b) All cranes, hoists, gears, chains, sprockets, shafting, and other mechanical power transmission, stationary engines, electrical equipment, and apparatus shall be properly guarded to protect workers from injury.

(c) All cranes, hoists, steam or electric shovels, plant railroads, and other apparatus or devices used for moving, lifting, lowering, and transporting material shall be designed, constructed, equipped, and operated as to eliminate dangerous conditions."

The record in this case demonstrates to a factual certitude that the defendants failed to abide by the standards of safety specified in the Act of Assembly above quoted.

In speaking of varying degrees of negligence, the great jurist Justice OLIVER WENDELL HOLMES once remarked: "If the manifest possibility of harm is very great, and the harm follows, we say that it is done maliciously or intentionally; if not so great, but still

considerable, we say that the harm is done negligently; if there is no apparent danger, we call it mischance."*

The lower court, in refusing to take off its nonsuit, said that it could assume without deciding that the defendants were guilty of negligence. Under the facts it could have gone further and submitted to the jury the question as to whether the defendants' negligence was not of such a degree as to bring it within the classification designated by Justice HOLMES as malicious. Their callous indifference to the death-inviting head-hole cannot under the decisions and the rationale of the case be regarded as anything less than wanton misconduct.

It was because experience had demonstrated that openings in elevator gates which permit the introduction of any portion of a person's body are hazardous to life and limb that the Department of Labor and Industry forbade by regulation (with the authority of the General Assembly of the Commonwealth behind it), any aperture in an elevator gate more than two inches in diameter.

The wanton misconduct on the part of the defendants in permitting this hazard to exist cannot be shrugged off, as appellee's counsel attempted to do in his brief by saying, with regard to the decedent's conduct, that "it would be hard to imagine a more stupid and dangerous thing to do." Sometimes people do stupid and dangerous things because of the flagrant, wanton and reckless disregard of their safety (which is a form of stupidity all its own) on the part of those charged with protecting that safety. Since the defendants failed to provide proper devices whereby tenants and employes in the building could summon the ele-

---

* Collected Legal Papers, Holmes; Harcourt, Brace & Holt, 1920, p. 118.

vator, the riders were compelled to use those facilities which *were* available.

It is common knowledge that although one may on first view recoil from a given danger, he may, on repeated views and continuing familiarity, finally treat it unemotionally and quite routinely. Other employes in the building employed the same method for summoning the elevator; the practise was well known to the officers and agents of the defendants, who thus more or less encouraged the practise. How, then, can Walter Hucaluk be convicted of legal contributory negligence for doing what had become commonplace and unavoidable? Was Hucaluk to quit his job because the defendants failed to provide a safer way in which to call an instrumentality needed in the conscientious discharge of his duties? He could, of course, on the day of the accident, have simply stopped working until the elevator in good time showed up, but apparently being one of those rare souls who believed in performing his duty promptly and expeditiously, he called for the elevator in the way that he had called for it for over three years, and in the only manner which the defendants left him for summoning it. Having for three years followed this procedure without mishap, Walter Hucaluk was lulled into believing that the possibility of injury was more apparent than real. The defendants allowed him to assume that the danger was an illusory one.

The lower court's description of the building and its portrayal of the elevator and its accessories leave much to be desired against the cold record of 449 pages. The Majority accepts that picture with all its unintending imperfections. For instance, it says: "There were electric bells at each floor for use if the presence of the elevator was required." There was one bell (not bells) on each floor but most of the time it was

as useless as an unlit lantern in the darkness. The witness Keshel testified: "Q. When he pushed the button, will you tell us whether or not there was any signal given? A. Well, there was a bell, but half the times it didn't work. Q. And on the occasions when the bell didn't work what would you do to attract someone to set the elevator in motion? A. Why, I had to . . . I had to stick in my head and yell to send the elevator down or shut the gate so the elevator could come down. Q. Did you see others do that? A. Yes, I did. Q. And can you tell us about how many times you saw others do that? A. Every time I was—Mr. Coleman: That's objected to. Q. In that period of time? A. Every time I was there. Mr. Fackenthal: That's objected to. THE COURT: The objection is overruled. Mr. Coleman: Exception, Your Honor. You may answer. A. Why, every time I was there I saw someone do it, because that, you couldn't locate the elevator no other way, just stand against it and look down, the gate, I mean, stand against."

The Majority Opinion says further: "There is not the slightest indication in the testimony that defendants were aware that decedent or any other person had any habit, as alleged, of putting their heads through the hole which would thereby cause them to be injured." The transcript of the record shows beyond the peradventure of a doubt that the defendants had *positive knowledge* of the fact that employes were required to use the opening in the elevator shaft to summon the elevator. James Nero, a foreman with the Universal Pants Company for ten years, testified that he often used the elevator in the presence of the four owner-managers: "Q. In whose presence did you use the elevator car, you individually? A. In front of Weinstein, in front of the Billera boys, in front of Salitsky; in

ten years I have used it in front of almost everybody."

. . .

"Q. Tell us what you did in using the elevator. A. Well, there were times I—THE COURT: Now, when is this, and in the presence of anybody or just himself? Q. In the presence of Mr. Weinstein? A. Yes, sir. I'd go downstairs some mornings, and Mr. Weinstein and Mr. Salitsky used to be talking. When I'd get down there, we'd start a conversation between the three of us. Well, we'd be talking here and there, and we'd be waiting for the elevator, and finally I knew they needed me upstairs, so I'd walk over to the elevator, and I'd try to ring the bell, and if the bell worked —if it didn't, I'd shove my head in the hole there and yell, 'Bring down that elevator; I need it.' Well, now, if they bring it down, all right; if not, Weinstein used to send up a boy to get the elevator, to see where it was located at. We needed it, because Weinstein would not walk up the steps very often. Then him and I would get in this elevator and I'd start it off, and I'd drop off on the second or third floor, whatever floor I wanted to go to, and he'd just go ahead about his business."

Mr. Weinstein himself admitted riding the elevator: "Q. But you rode in the elevator, didn't you? A. Correct. Q. And you have been using that elevator, ever since you have been in that building, for your purpose of getting from one floor to another? A. Yes, sir."

Nero testified to seeing others use the port hole in the elevator gate to as late a date as June, 1947: "Q. What did you see others do in 1945 in using the elevator? A. Walk over there, and if the elevator wasn't around, shove their head in that hole and holler for the elevator. Q. What did you see others do in 1946?

A. The same thing. Q. In using the elevator? A. The same thing. Q. What do you mean by 'the same thing?' A. If the elevator wasn't around, they'd ring the bell; if the bell didn't work, they'd put their head in and holler. That's what they did. Q. And what did you see them do in '47, from January to June of '47? A. The same thing as I said before?"

Then, there was precise and undisputed testimony that the custom of hailing the elevator through the opening in the elevator gate persisted to May, 1948, when the accident occurred: "Q. Mr. Keshel, what would you do after you pushed the button? A. Well, the next best thing to do is to yell. Q. Not the next best thing—what would you do on those occasions between January and May, 1948? Mr. Fackenthal: If the Court please, that's objected to as an attempt to establish a custom in an improper manner. THE COURT: The objection is overruled. Note an exception. Q. You may answer, Mr. Keshel. A. Why, I'd have to stick my head through it, to yell up or down, wherever the elevator was and yell, 'Send the elevator down,' or 'shut the gate,' so the elevator would come down; because you could not locate the elevator by just standing against the gate because there was, well, poor lighting, you could not see. It was dark and shadows."

In defining negligence and wanton misconduct, the Majority Opinion quotes from Chief Justice HORACE STERN in the case of *Kasanovich v. George,* 348 Pa. 199: "Negligence consists of inattention or inadvertence, whereas wantonness exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong. Having in mind this characterization of wanton misconduct, it will be readily seen that the principle that

contributory negligence is not a defense to an action for a tort involving such misconduct is not in conflict with the rejection in Pennsylvania of the doctrines of 'comparative negligence' and 'last clear chance' hereinbefore referred to."

Although the Majority quotes this excellent statement of the law, it fails to apply it. How can it be doubted that the facts in this case demonstrate on the part of the defendants "a conscious indifference to the perpetration of the wrong"? In the *Kasanovich* case a street car motorman ran down a pedestrian in full view on the tracks ahead. The pedestrian was seen by the motorman for only a matter of seconds. The decedent in this case was in the supervisory view of the defendants for over three years. They knew of the dangerous condition for over ten years. If a motorman is pronounced guilty of wanton misconduct because, forgetting himself for a matter of seconds, he runs down a wayfarer, what must be the characterization in point of legal liability of a building owner who callously and wantonly allows a death-trap to continue over a period of years?

In the *Kasanovich* case this Court said that it was a question for the *jury* to decide whether "the motorman was guilty of wanton misconduct, that is, if he exhibited a reckless disregard for decedent's safety after observing his perilous position and realizing the danger involved in proceeding at a high rate of speed and without giving warning of his approach." Why, then, is not the question of liability in this case one for the jury? The appellant-widow does not in this appeal ask for an award of damages; she only asks in behalf of herself and her four young orphans that she be permitted to present her case to a jury. I would allow her and her fatherless offspring the right to present their case before a jury.

Since no one witnessed the fatal accident, Mrs. Hucaluk is entitled to the presumption that her husband used the care of a reasonably prudent man to avoid widowing her and orphaning their children. This presumption, (together with the undisputed evidence of a years-long custom and usage of countless persons doing just what her husband did,) entitles the plaintiff to a factual determination of the issues by 12 men and women in accordance with the principles of trial by jury guaranteed in our Constitution.

It will be recalled that when Harsh, on the day of the accident, returned to the shaft after performing a chore on the second floor, the elevator was missing. Who moved the elevator? Did that undisclosed person, after taking the elevator to a higher floor, send it down again without first sounding some kind of warning? If so, was this an act of negligence which could be imputed to the defendants? Did Harsh, discovering that the elevator was gone from the second floor, suddenly pull the cable, even in a seizure of anger, and thus precipitate the sudden movement of the car which collided with the decedent? If so, was this negligence imputable to the defendants? Was the elevator and all its appurtenances of sufficient modern construction to meet the requirements of safety as dictated by the standards of safety of the day?

Since the defendants were undisputably aware of the hazard to which the decedent and all other persons in the building were subjected because of the defective elevator shaft, were they not guilty of wanton misconduct in failing to post a suitable placard warning employees not to use the head-hole? Were they not guilty of supreme neglect in not taking down this noose? Were they not flagrantly violating all rules of safety by not hiring skilled and trained elevator personnel, etc., etc.? All these matters were questions

of fact which could be and should be permitted, under proper instructions of the trial court, to a jury.

In the light of all the circumstances of the case: the usage in the factory, the necessity for calling the elevator in the only way left to call it when other methods failed, and the failure of the defendants to make the other methods work, I do not see how any court can, with a full appreciation of all the interweaving facts and circumstances, declare that Walter Hucaluk's conduct was by law contributory negligence. And if it was contributory negligence, I fail to see how, as a matter of law, wanton misconduct can be ruled out of the many-years-old persistent negligence on the part of the defendants.

Blindfolded as the figure of justice is portrayed to be, the blindfold is not intended to shut off the vision of the law in the fulfillment of its bounden and sacred duty to correct injustice and remedy wrong. Not every elevator in the State reports have crushed out venerated principles of justice, law, and logic as the elevator in the Clyde Building in Northampton crushed out the life of Walter Hucaluk.

In *Ferry v. Phila. Rap. Transit Co.*, 232 Pa. 403, the plaintiff's decedent was killed by an elevator which descended upon him while he was working in the basement beneath the elevator. The plaintiff charged the defendant with negligence in failing to guard the space in the floor of the building upon which the elevator descended and in failing to equip the elevator with a gong or other device to warn in advance of the elevator's descent anyone who might be under it. The lower court entered a compulsory nonsuit against the plaintiff on the ground that the decedent was guilty of contributory negligence and, further, that no negligence against the defendant company had been established. This Court, in removing the nonsuit, said: "We have then

the fact of an elevator not equipped with warning signals, permitted to work quietly up and down in a space not guarded from access, but where workmen were at liberty to walk or stand, in the use of the floor, and which space was apparently directly in the line of their approach to an opening or doorway leading to another portion of the building. Then the decedent was found in this space, and at the doorway, crushed by the elevator. From a consideration of all circumstances disclosed by the evidence, we cannot say that reasonable and well balanced minds might not fairly conclude that the accident resulted from negligence by the defendant. Whether it did or not, was for the jury to say, as it was for them also to determine the question of contributory negligence upon the part of the person who was killed."

In *Strobel v. Park*, 292 Pa. 200, the plaintiff's decedent was killed while riding on an elevator which was not equipped with a safety gate. In affirming the verdict returned in favor of the plaintiff, this Court said: "If an accident may be reasonably anticipated as the natural and probable result of the absence of guards or doors on all sides of elevator cars hauling passengers, then the failure to provide this protection is per se negligence. The duty rests on the carrier of passengers to see that the instrumentality used to convey passengers should be constructed so as to be reasonably safe, according to the use to be made of it. The duty holds the owner or the carrier to the highest degree of care and foresight. A passenger, entering an elevator, commits himself absolutely to the care and protection of the owner so far as the operation of the car and its construction is concerned. If the construction of the elevator car permits the passenger to reach the elevator shaft while the car is in motion, it cannot be termed as anything less than dangerous. Take the

present instance, this cage, crowded or uncrowded, permits one standing near the unprotected end, by a nod of his head, to receive a blow that would kill him, or, by extending his arm or shoulder outside the path of the car, to receive a severe wound. The rule announced in this and other states means precisely what it says. *The owners of elevators are held to the highest degree of care in the construction of cars, and, when an elevator carrying passengers is operated without protection on all sides, that is negligent construction."*

Even if Walter Hucaluk may have been aware (with the other 300 employes in the building) of the danger attendant upon using the elevator in the manner described, this awareness of itself did not outlaw the right inherited by his widow to sue those responsible for his death. In the case of *Ulm v. McKeesport Tin Plate Co.,* 263 Pa. 327, the plaintiff was injured when he oiled certain machinery which was in motion. He knew from observation that it was safer to wait until the machinery was stopped before oiling it, but this was not always possible. The foreman in charge of the shop knew of the dangerous practise but made no attempt to prevent it. One day, while engaged in the hazardous work the plaintiff slipped and his arm fell into the moving cogs with consequent mangling injury. In the ensuing lawsuit the defendant company argued that since the plaintiff was conscious of the danger inherent in the operation he was performing, he could not recover. This Court, however, in affirming the verdict which the plaintiff received from the jury, quoted from the case of *Fortney v. Breon,* 245 Pa. 47, 52-4, as follows: "True, there was danger in so doing, but the existence of danger does not prove negligence. If it did, there would be no safety except to abandon the use of machinery. .

" 'The testimony before us indicates that it was not the custom of the defendant's establishment to stop the machinery when work was being performed thereon of the character which the plaintiff was engaged upon when he was hurt; on the contrary, it rather suggests the reverse as the rule of the shop. Under such circumstances, although the plaintiff might be guilty of an assumption of risk (which defense was not available in the present case: Jones v. American Caramel Co., 225 Pa. 644, 652), yet, simply because he worked at machinery in motion, he would not be guilty of per se negligence.' "

Did the defendants acquit themselves of their responsibility as owners and managers of a building which housed under its roof 300 people and an erratic mechanism as intrinsically dangerous as an uncaged beast of violence? What was the duty of the defendants to the decedent? In the case of *Bisson v. Kelly, Inc.,* 314 Pa. 99, Chief Justice MAXEY generically answered that question as follows: "It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty the *law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable. A normal human being is held to foresee those injuries which are the consequence of his acts of omission or commission which he, as a reasonable human being, should have foreseen. The question whether a person charged with negligence or negligent acts or omissions should have foreseen the injuries resulting from those acts or omissions is *for the jury,* if there is any credible evidence from which a reasonable con-. clusion can be. drawn in support of the claim of neglect of duty. 'A verdict should not be directed if on

all the facts and circumstances there is room for fair and sensible men to differ in their conclusions.': McCracken v. Curwensville Boro., 309 Pa. 98, 114, 163 A. 217."

No one is expected to provide against the absolutely unforeseeable. No property owner would be held liable in damages if the roof of his building caved in under the pressure and momentum of a comet fragment or meteor fragment falling from the skies. But there is nothing celestial about an elevator. Its machinery, operation, and movements are open to inspection, study, and supervision. Its future performance can be anticipated from its past. If it is encased in a shaft that is so defective that people may fall into it, the property owner can foresee that one day that elevator will run down a fallen victim. If the shaft is so open to the public that riders will, still exercising ordinary care and prudence, look into it in seeking transportation, *that* is also something that is foreseeable, to be anticipated, and to be guarded against.

Did the owners in this case exercise all the care required of them by the law? Did they foresee the foreseeable, did they anticipate what was so clearly written in the book of anticipations, did they evaluate the inexorable law of cause and effect? These were all questions of fact for the jury, because they are matters within the sphere of human observation, calculation, and appraisement. The action of the lower court in withdrawing these questions from the jury was a flagrant abuse of discretion which has been countenanced and affirmed by this Court. By doing so, a widow and four orphans have been deprived of a right guaranteed to them by the law of the land. And I accordingly vigorously dissent.